UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X
SUM CHAN,

                        **Plaintiff,**

          **v.**

THE CITY OF NEW YORK, POLICE OFFICER
RAFFAELE BARILE, POLICE OFFICER STACEY
BYRNES, POLICE OFFICER REBECCA STEIN,
POLICE OFFICER TENZIN NYNDAK, POLICE
OFFICER BRIAN PORZELT, LIEUTENANT
ANTHONY ANDINO, QI JU WENG  &
S&L NAIL SPA INC.,

                     **Defendants.**
---------------------------------------------------------------------------X

**Case No. 19-cv-7239-RPK-SJB**

**SECOND AMENDED COMPLAINT**[1]
**(As Amended 12/29/2021 & 01/14/2022)**

**DEMAND FOR JURY TRIAL**

     Plaintiff SUM CHAN (hereinafter "plaintiff"), by and through his attorney herein, Michael R. Curran,

Esq., alleges the following in connection with this consolidated suit in negligence, violation of plaintiff's

civil rights and, as to the civilian defendants, intentional tort and related claims and State negligence:

## NATURE OF THE ACTION

1.     Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees

pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violation of his civil rights under 42 U.S.C. § 1983

and the Fourth and Fourteenth Amendments to the United States Constitution.  Plaintiff asserts claims

under federal and State law as to the government actors.  As to the civilian defendant, QI JU WENG

("Weng"), plaintiff cites claims of intentional tort and other claims under New York State law, leading to

state action herein.  As to newly added civilian corporate defendant, S&L NAIL SPA INC. of Uniondale,

New York ("SL Nail Spa"), plaintiff alleges negligence and negligent employment of Weng, also as New

---

[1]Amendments are based upon discovery received December 2020, in particular body-worn camera ("BWC") videos.

York State law claims.  The corporate defendant was disclosed through provision of discovery by defendant Weng.  Seven BWC videos are incorporated herein as integral to the allegations.[2]

## JURISDICTION

2.      This Court has jurisdiction over plaintiff's federal law claims under 28 U.S.C. §§ 1331, 1343(a)(3),(4).

3.      This Court may also exercise supplemental jurisdiction over the plaintiff's State law claims that arise from the same facts and circumstances under 28 U.S.C. § 1367 as to the State actors.

4.      The Court may have jurisdiction over the person of Weng, non-state actor, through conduct that may invoke jurisdiction under 28 U.S.C. §§ 1332, 1343 and/or 1367.   In the event the Court finds no federal jurisdiction over Weng, plaintiff requests the Court to order remand to the applicable State court.

5.      The Court may have jurisdiction over corporation S&L Nail Spa, non-state actor, through conduct that may invoke jurisdiction under 28 U.S.C. §§ 1332, 1343 and/or 1367.   In the event the Court finds no federal jurisdiction over S&L Nail Spa, plaintiff requests Court remand to the applicable State court.

## JURY TRIAL DEMANDED

6.      Plaintiff demands trial by jury of all issues properly triable thereby.

## VENUE

7.      Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b),(c), as all events herein occurred within the territorial Eastern District of New York.

## CONDITION PRECEDENT SATISFIED AS TO THE MUNICIPALITY

8.      As to the municipality of the City of New York, a Notice of Claim was timely filed on March 26, 2019, with the New York City Comptroller at 1 Centre Street, New York, New York 10007, following dismissal of the criminal action brought against plaintiff.  The Notice of Claim was assigned Claim No.

---

[2]Provided to the Court by the Law Dept.

Page **2** of **41**

**2019PI008457** by the City of New York.  Plaintiff appeared for the requisite hearing pursuant to Section 50-H of the General Municipal Law held on June 26, 2019, conducted by the private law offices of a firm retained by the City of New York.  These actions have satisfied the condition precedent for bringing a legal action against the City of New York and its subdivisions and individual actors.

### THE PARTIES

9.      Plaintiff SUM CHAN is a United States citizen and citizen and resident of the City and State of New York, residing in Queens County, New York.

10.      That, at all times herein mentioned, defendant CITY OF NEW YORK (hereinafter "City") was and is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

11.      That, at all times herein mentioned, defendant City operated, controlled and maintained a municipal police force known as the New York City Police Department (hereinafter "NYPD"), who were empowered and authorized to arrest, detain, book, prepare paperwork on, assign NYSIDs to suspects, notify federal law enforcement entities of and produce for prosecution criminal suspects, perpetrators or accused.

12.      Defendant POLICE OFFICER RAFFAELE BARILE (hereinafter "P.O. Barile"), at all times herein mentioned, was employed by the NYPD at the 109th Police Precinct.

13.      That, at all times herein mentioned, defendant P.O. Barile was acting within the course and scope of his employment with defendant City and the NYPD.

14.      That, at all times herein mentioned, defendant P.O. Barile was acting under color of state law.

15.      Defendant P.O. Barile is sued herein in both his individual and official capacities.

16.      Two BWC videos associated with P.O. Barile, as disclosed in discovery, are the videos labeled as **2018-12-26_09-58-46.AVI, VS-2484154** and **2018-12-26_10-11-16.AVI, VS-2484152** ("Barile videos").

17.     Defendant POLICE OFFICER STACEY BYRNES nee Rao (hereinafter "P.O. Byrnes"),[3] at all times herein mentioned, was employed by the NYPD at the 109th Police Precinct.

18.     That, at all times herein mentioned, defendant P.O. Byrnes was acting within the course and scope of her employment with defendant City and the NYPD.

19.     That, at all times herein mentioned, defendant P.O. Byrnes was acting under color of state law.

20.     Defendant P.O. Byrnes is sued herein in both her individual and official capacities.

21.     The BWC video associated with P.O. Byrnes, as disclosed in discovery, is the video labeled as **2018-12-26_09-51-34.AVI, VS-2485482** ("Byrnes video").

22.     Defendant POLICE OFFICER REBECCA STEIN (hereinafter "P.O. Stein"), at all times herein mentioned, was employed by the NYPD at the 109th Police Precinct.

23.     That, at all times herein mentioned, defendant P.O. Stein was acting within the course and scope of her employment with defendant City and the NYPD.

24.     That, at all times herein mentioned, defendant P.O. Stein was acting under color of state law.

25.     Defendant P.O. Stein is sued herein in both her individual and official capacities.

26.     The BWC video associated with P.O. Stein, as disclosed in discovery, is the video labeled as **2018-12-26_09-52-08.AVI, VS-2484206** ("Stein video").

27.     Defendant POLICE OFFICER BRIAN PORZELT (hereinafter "P.O. Porzelt"), at all times herein mentioned, was employed by the NYPD at the 109th Police Precinct.

28.     That, at all times herein mentioned, defendant P.O. Porzelt was acting within the course and scope of his employment with defendant City and the NYPD.

29.     That, at all times herein mentioned, defendant P.O. Porzelt was acting under color of state law.

30.     Defendant P.O. Porzelt is sued herein in both his individual and official capacities.

---

[3] Upon information and belief former P.O. Stacey Rao.

31.     The BWC video associated with P.O. Porzelt, as disclosed in discovery, is the video labeled as **2018-12-26_09-53-08.AVI, VS-2485512** ("Porzelt video").

32.     Defendant POLICE TENZIN NYNDAK (hereinafter "P.O. Nyndak"), at all times herein mentioned, was employed by the NYPD at the 109th Police Precinct.

33.     That, at all times herein mentioned, defendant P.O. Nyndak was acting within the course and scope of his employment with defendant City and the NYPD.

34.     That, at all times herein mentioned, defendant P.O. Nyndak was acting under color of state law.

35.     Defendant P.O. Nyndak is sued herein in both his individual and official capacities.

36.     Two BWC videos associated with P.O. Nyndak, as disclosed in discovery, are the videos labeled as **2018-12-26_09-58-38, AVI, VS-2484155** and **2018-12-26_10-10-10.AVI, VS-2484153** ("Nyndak videos").

37.     Defendant LIEUTENANT ANTHONY ANDINO (hereinafter "Lieutenant Andino"), at all times herein mentioned, was employed by the NYPD at the 109th Police Precinct, in a supervisory capacity.

38.     That, at all times herein mentioned, defendant Lieutenant Andino was acting within the course and scope of his employment as a supervisor with defendant City and the NYPD.

39.     That, at all times herein mentioned, defendant Lieutenant Andino was acting under color of state law as a supervisory employee.

40.     Defendant P.O. Lieutenant Andino is sued herein in both his individual and official capacities.

41.     No BWC camera video was produced for Lieutenant Andino, although the Lieutenant appears to be wearing a body-worn camera in the following BWC videos: (1) Byrnes video; (2) Stein video; (3) Porzelt video; (4) Barile (two videos); and (5) Nyndak (second video, after 10:00 a.m., on date in question).

42.     The City of New York and police offers above are collectively "City defendants" herein.

43.     Defendant QI JU WENG (hereinafter "Weng") is a private state actor and was apparently the owner of and employer of himself by the S&L Nail Spa (the "Spa") at the time of the events herein.

44.     Defendant Weng is a resident of Queens County within the territorial jurisdiction of this Court.

45.     That, at all times herein mentioned, defendant Weng, alleged by the City, NYPD, Lieutenant Andino, P.O. Barile and P.O. Byrnes to be a victim of assault with a weapon by plaintiff on December 26, 2018, was in reality the perpetrator or assailant who assaulted plaintiff causing the plaintiff serious physical injury and who, in league with Spa employees, instigated plaintiff's arrest by the state actors.

46.     That, at all times herein mentioned, defendant Weng is believed to have been transporting employees to the Spa in Long Island, where Weng was owner or a partner in said business.

47.     That, at all times herein mentioned, defendant Weng may have been violating federal law as the employees Weng was transporting may have been working without employment authorization.

48.     That, at all times herein mentioned, the actions of the state actors may have willfully, purposefully or negligently facilitated Weng's implication of plaintiff as the perpetrator of an assault.

49.     Defendant Weng is sued in his individual capacity but also as an employee of the Spa.

50.     That, at all times herein mentioned, defendant Spa is/was a domestic New York State corporation.

51.     That, at all times herein mentioned, discovery shows that defendant Weng was an employee and owner or partner in defendant Spa and that on, December 26, 2018, he was acting in an official capacity as employee/owner of the company.

52.     That, at all times herein mentioned, defendant Spa, either owned by or employing defendant Weng, negligently engaged or assigned defendant Weng to his duties aware of his propensities for violence.

53.     That, at all times herein mentioned, defendant Spa is liable for employing and retaining defendant Weng on December 26, 2018 and for negligently permitting him to act as a driver with awareness of his

propensity for violence.

54.     That, at all times herein mentioned, defendant Spa is liable to plaintiff for injuries he suffered due to the negligence of Spa in negligently employing defendant Weng aware of Weng's violent propensities.

### STATEMENT OF FACTS

### THE ATTACK BY QI JU WENG UPON PLAINTIFF SUM CHAN

55.      Plaintiff restates and realleges the allegations contained in Paragraphs "1" through "54" above as if set forth more fully herein.

56.     The facts stated in this Complaint are based, *inter alia*, on the personal knowledge of plaintiff regarding events in which he was directly involved and "upon information and belief."  The sources of "upon information and belief" factual statements are either from pure observations of the plaintiff based upon his own personal knowledge or are derived from documents, in particular BWC videos, from the underlying criminal prosecution, public documents from public sources or discovery provided by defendants.  These sources may be incomplete and may require further, limited discovery.

57.     On December 26, 2018, at or about 9:30 a.m., plaintiff, age 69 at the time, who worked part-time for a Chinese-owned bus company, but who was not working on this particular date, drove his privately-owned automobile into the small diner parking lot of the "Lake Pavilion," Flushing, Queens County, New York (the diner"), near Queens Chinatown. The diner was located near the service road for the Long Island Expressway, off of Main Street, and was a popular local breakfast spot in the Chinese community.

58.     Plaintiff, who is Cantonese Chinese, observed that defendant Weng, who is mainland Chinese, was sitting in his van, blocking a number of parking spaces in the small lot.  In the van, plaintiff saw Chinese women, who have been identified as Hau Yin Weng, Mei Zhi Zheng, Bi Zhen Zou and Lan Zhu Chen. (One of the women was Weng's wife, who later spoke to police.)  The women were disclosed by defendant

Weng as employees of S&L Nail Spa of which defendant Weng is owner or partner.  (One woman present, with solid English skills, was probably Weng's partner in the Spa, who later spoke at length with police, advocating for Weng) ("Weng's business partner.")    It appeared to plaintiff that defendant Weng was bringing the women home or taking them to the workplace, which was learned to be the nail salon, the Spa.

59.    Plaintiff was not interested in what defendant Weng was doing, he just wanted him to move so he could park his car in the small parking lot so he, plaintiff, could go eat breakfast in the Chinese diner.

60.    Plaintiff got out of his car and walked over to defendant Weng's van, tapping on the window. Plaintiff asked Weng to move so he, plaintiff, could park, as Weng's van was blocking spaces.

61.    Weng rolled down his window about 3.5 to 5 inches and asked what plaintiff wanted.

62.    Plaintiff stated what he wanted in Cantonese—that he wanted Weng to move his van—but switched to Mandarin.  Potentially, the two parties did not understand one another at first, which led to argument.

63.    Plaintiff repeated himself.  He wanted Weng to move up, so he could park.

64.    Instead of responding, defendant Weng, age 46, became enraged.  Weng, wearing a blue-black jacket and pink pants, suddenly exited from his burgundy Honda van, cursing plaintiff, and picked up a large piece of metal, which Weng claimed in discovery was a piece of an air conditioning filter, making as if he were going to strike plaintiff with this metallic implement.[4]

65.    Plaintiff pulled out a tiny cuticle scissors he had in the fanny pack he was wearing to defend himself, pointing them to the sky.  The scissors were about 3.5 inches in length, clearly not a weapon. Plaintiff told Weng "be careful," but said nothing more.  (Weng's wife in Brynes video confirmed words.)

66.    Women in the van, probably because they were afraid of the police becoming involved, came out of the van and told defendant Weng to drop the metallic object, which he did.  Plaintiff put the cuticle scissors back into the fanny pack he was wearing around the middle of his body and tried to leave the scene.

67.     Defendant Weng was not finished.   Extremely incensed, he came over to plaintiff and punched plaintiff, a senior, in the throat, causing red abrasions and bleeding.  Defendant then kicked plaintiff in the leg, causing plaintiff to fall backwards on top of his left wrist, which broke.   The broken wrist, kick to the leg and injury to plaintiff's throat caused plaintiff great pain and emotional suffering.  When plaintiff fell, he also scraped his arm, causing bleeding.   Weng was seen kicking plaintiff while he lay on the ground.

68.     Weng then went over and kicked the door on plaintiff's car, inflicting damage later appraised at $937.68.  (Plaintiff had taken several photos of defendant Weng, his van and the damage to plaintiff's car.)

69.      A nearby Caucasian witness, who appears in police bodycam videos as a heavyset white male in a blue, quilted coat, speaking with a New York urban accent, told plaintiff he would call police, which he did.  The witness told plaintiff to take photos, which plaintiff did.  When police arrived, they spoke with this witness at length.  He clearly identified himself as Gerald Pecora, an employee of the Queens Library.[5]

## THE POLICE ARRIVE UPON THE SCENE OF THE ATTACK[6]

70.     The NYPD responded in 15 to 20 minutes.   When the NYPD arrived, plaintiff was bleeding from his throat, where he had been punched by Weng and was holding his broken wrist forward, supporting it with his opposing arm, clearly injured and in much pain.  He also had a bleeding arm injury.  Plaintiff was in "delirium"[7] and was unable to properly communicate in English, as his primary method of communication is/was Cantonese Chinese.  (P.O. Stein remarked plaintiff seemed "out of it.")  The NYPD apparently did not arrive with a translator in the Chinese language, although Flushing is a Chinese community and the 109th Police Precinct involved is in a central location of the Chinese community.

71.     In accordance with City disclosures, the following NYPD officers responded: P.O. Barile, P.O.

---

[4] The police completely missed this fact.
[5] Multiple officers spoke to this man.
[6] Revised by discovery and disclosed BWC videos.
[7] Opinion of Perry Starer, M.D., who reviewed ER records (in court files).

Nyndak; P.O. Byrnes; P.O. Stein; P.O. Porzelt; and Lieutenant Andino.  Also allegedly present were: P.O. Andrew Amoroso; P.O. Danny Tse; P.O. Robert Marciano; and P.O. Hunna Lipke.  Originally, City defendants' counsel identified Lieutenant Andino, in some references, as "Sergeant" Andino.

72.     The following officers were identified in discovery as having body cameras that were trained on plaintiff and Weng at the time they encountered them: P.O. Byrnes; P.O. Barile; P.O. Nyndak; P.O. Porzelt; and P.O. Stein.  The recordings from the bodycams record the narrative of events.

73.     The first two officers on the scene, per disclosures, were P.O. Byrnes, **2018-12-26_09-51-34.AVI, VS-2485482** (Byrnes video), and P.O. Stein, **2018-12-26_09-52-08.AVI, VS-2484206** (Stein video).

74.     The first video in time sequence is that of P.O. Byrnes.  The officer is seen energetically driving up, jumping out of her vehicle and enthusiastically beginning to question Weng and Chinese women milling about Weng's Honda van ("Step out of the car.  What happened?  What happened?  Step out of the car."). (The radio run disclosed in discovery identified Weng's van as vehicle of the "perpetrator" of the assault.) From the start of the video, Officer Byrnes seems to be pulling words out of the mouths of Weng and his Greek chorus of feminine companions, in particular Weng's business partner who articulates about 70% of the story.  It was from these women the claim that plaintiff "choked" Weng is improvised, aggressively extracted—or suggested—by P.O. Byrnes.  It was ultimately alleged that 69-year-old plaintiff got out of his car and reached through a 3.5-5-inch aperture, some said with one hand, and began choking 46-year-old virile Weng.  A tiny shaving cut was displayed at an odd angle on the side of Weng's neck.   Officer Byrnes muddles the facts but makes it seem plaintiff was the aggressor, when it was plaintiff who exhibited signs of having been beaten up.  Officer Byrnes then goes to Lieutenant Andino and essentially stages the tale for her supervisor.  Lieutenant Andino oddly adopts the story without scrutiny, though he has received reports that plaintiff is badly injured.  It was exceedingly, suspiciously arbitrary.

75.     Earlier in the Byrnes video, Lieutenant Andino is seen in the background, circling around the scene, ending up firmly planted with Weng and his cohort.  It is unclear from where Andino has come.  From that point in the first few minutes of the police presence, Lieutenant Andino remains with Weng and company for about 85% of the time the police are on the scene of the altercation.   Throughout her video, Officer Byrnes continues to peddle the irrational tale that Weng is a victim.  Byrnes's video seems truncated.  In discovery, P.O. Byrnes incredibly stated she didn't recall if the plaintiff had required medical assistance.

76.      Police Officer Robert Marciano in Byrnes's video takes a prominent role with Weng and company, seemingly arriving with Lieutenant Andino.  He uses the same story-extracting approach with Weng, taking the side of Weng, but never speaking to or even seeing plaintiff.  P.O. Marciano does two interesting things in the videos: (a) he is seen turning off or turning on his body worn camera (no video was produced for this officer) and (b), when witness Pecora shows Marciano there are building cameras directly focused on where the alleged altercation occurred, Marciano turns his back on what he is shown.

77.     The second video in time sequence is of P.O. Stein.  P.O. Stein, at least from the videos, is the only officer who scrutinizes plaintiff's injuries and seems sympathetic to plaintiff.   P.O. Stein recounts in the video the injuries of plaintiff: broken wrist, bloody throat/neck and bleeding arm/wrist injury.  She indicates the injuries to P.O. Byrnes, her alleged patrol partner, who shrugs off the injuries, reiterating the tiny scratch on Weng's neck as a form of proof of something left unsaid.  P.O. Stein does a very thorough search of plaintiff's fanny pack and is the first to discover the tiny cuticle scissors.  Witness Pecora and the women with Weng had claimed plaintiff had a razor or "knife scissors," which claim was completely dispelled by first P.O. Stein, then all officers, agreeing that the tiny cuticle scissors were what plaintiff possessed.  Completely missed by the police, since they did not question plaintiff properly with or without an interpreter, was the metallic object Weng had brandished at plaintiff, as an alleged weapon.  It was

plaintiff who was defending himself, not Weng.  Lieutenant Andino, irrationally, completely reversed the roles of Weng and plaintiff, finding Weng was the victim, defending himself.  All appreciable evidence pointed against this conclusion—and Andino a long-term veteran of the NYPD by this time, as indicated below.  P.O. Stein's video seems shortened.  P.O. Stein is seen in several sequences in the background and assisted plaintiff in going to and being admitted to the FDNY/EMS ambulance called to the scene.[8]

78.      The next video in time sequence is that of P.O. Porzelt, **2018-12-26_09-53-08.AVI, VS-2485512**, who arrived relatively contemporaneously on the scene with P.O. Byrnes and P.O. Stein.  Officer Porzelt, in a video of short length (3 mins. 20 seconds, no sound for the first 20 seconds) provides little more than comic relief—if the viewer's sense of comedy includes disparaging remarks about Chinese, remarking on the cuticle scissors: "He was probably clipping his nails. * * * * They have no hygiene whatsoever.  You can see them sitting at a pool table" [imitates nail clipping].  Porzelt verifies that plaintiff possessed a harmless device for grooming or "hygiene," tiny cuticle scissors—and no weapon.  P.O. Porzelt remarks that his video is "done" before he either shuts it off or the camera runs out of capacity.  Officer Porzelt is seen throughout the various first five videos (beginning prior to 10:00 a.m.), wandering about the scene, talking in particular to Lieutenant Andino, offering running commentary during the first 10-15 minutes.

79.      Next in time sequence is the video of P.O. Nyndak's BWC, **2018-12-26_09-58-38, AVI, VS-2484155**, which has the distinction of being the shortest video, clocking in at 2 mins., 23 seconds.  Nyndak arrives late on the scene, around the same time as P.O. Barile, one of the original defendants.  Counsel for City defendants allege P.O. Nyndak was P.O. Barile's "partner," although the relationship is not familiar, but appears stiff and formal in the videos.  Unlike other videos, while officers in other videos are overheard in the background, P.O. Nyndak is only heard speaking in the Nyndak videos and those of P.O. Barile.  Nyndak is told by a female officer—not Byrnes or Stein—that Weng got out of his van and "started

---

[8]Stein had a duty to intervene in plaintiff's arrest.

throwing punches" and plaintiff pulled out the cuticle scissors—once more omitting the fact Weng picked up the metal implement, which no officer elicited at the scene. P.O. Nyndak turns off his body-worn camera, saying: "Alright, nothing going on."

80.     Next in sequence is the first Barile video, **2018-12-26_09-58-46.AVI, VS-2484154**. This video reflects the totality of P.O. Barile's alleged "investigation." At around 10:01 a.m., 12/26/2018, Lieutenant Andino "gives" both arrests to P.O. Barile—for plaintiff on various assault charges and Weng on a criminal mischief charge. (Weng, after beating up plaintiff, had kicked plaintiff's car door, causing substantial damage.) P.O. Barile traipses back and forth, in the Barile video, writing down information but doesn't ask a single investigatory question of <u>either</u> defendant. What is the source for P.O. Barile's information? Essentially, he takes almost his entire script from Lieutenant Andino. P.O. Barile: (a) never asks a single question of plaintiff except for his ID information, while plaintiff is sitting in the ambulance, being treated for his injuries (broken wrist, bleeding neck and arm); (b) never asks any investigatory questions of defendant Weng; and (c) never even looks at plaintiff's car to assess the damage for the criminal mischief charge. All information he relies on is second-hand, hearsay, derived primarily from Andino, Barile's supervisor. When plaintiff, sitting in the ambulance, attempts to ask Barile a question, Barile shuts plaintiff down. That was the only time in any video that there was an attempt to exchange information—even more significant as plaintiff was befuddled, suffering from delirium after the attack by Weng. P.O. Barile acts more like a scribe that a police officer. P.O. Barile volunteers to drive Weng to the 109th Precinct to process Weng. Plaintiff is taken by ambulance to New York-Presbyterian Hospital-Queens, a short distance away. Plaintiff is escorted by P.O. Amorosa, who is seen in the first Barile video. Plaintiff was in the custody of P.O. Amorosa from 10:13 a.m. (in the ambulance) until roughly 4:00 p.m.

81.     The next two videos are: (a) P.O. Nyndak video #2, post-10:00 a.m., 12/26/2018, **2018-12-26_10-**

**10-10.AVI, VS-2484153**, and (b) P.O. Barile video #2, post-10:00 a.m., 12/26/2018, **2018-12-26_10-11-16.AVI, VS-2484152**.  These videos portray Officers Barile and Nyndak conveying defendant Weng to the 109th Precinct.  The videos seem relatively benign, but also have unusual features:

(a)       P.O. Nyndak video #2:  In this video, Officers Barile and Nyndak escort defendant Weng to the 109th Precinct, where Weng was later released on a desk appearance ticket (D.A.T.).  P.O. Nyndak sits in the back of the police car with Weng, as there is no "cage" between the driver and passengers in the back seat of the particular car.  Most striking about the video is the fact that Nyndak is almost tenderly solicitous of Weng from the time Weng is escorted from the site of the arrest to the moment when he puts Weng into a holding cell.  Nyndak took no part in the arrest or investigation yet seems to know certain facts.  There is a gap of about ten minutes between Nyndak's first video and the second.  As stated, the first video is less than 2 ½ minutes long, while the second video is the longest video among videos disclosed by the City of New York at 16 minutes, 52 seconds in length.  As an example of the knowledge that Nyndak seems to have gained from another source, after P.O. Barile states that Weng will be charged with criminal mischief, Nyndak queries whether Weng "kicked something."  Nothing in the conversation between Barile and Nyndak would have led to this conclusion by Nyndak.  Thereafter, Nyndak opines that Weng could not have caused more than $250 in damage from what Weng did to plaintiff's vehicle—without having inspected the damage.  Following this discussion, Nyndak predicts that Weng will be given a D.A.T. and will be released.  Constantly throughout the video, Nyndak apologizes to Weng, which is certainly odd.  Finally, when Nyndak locks Weng in the cell, P.O. Nyndak becomes effusive in his apologies.  It is odd behavior.  It seems the video was a staged performance by Nyndak.  In discovery, it was alleged that Nyndak "retired."  According to The City Record Online, P.O. Nyndak resigned on 10/19/2019.

(b)       The next and final video in the chronology, as stated above, is Barile video #2.  This video is the

companion to the Nyndak video above, as both men transported Weng to the 109th Precinct and the video is the second longest produced by the City defendants at 13 minutes, 54 seconds.  The first words a viewer hears when the sound starts is: "You did nothing wrong until you kicked his car."  This sentence was repeated numerous times to Weng by various officers, never mind that Weng had beaten up the plaintiff, upon which no officer in the videos clearly remarks.  On the way to the 109th Precinct, the two officers, Barile and Nyndak, discussed Weng's charges.  They agreed in the end that Weng would be charged with Criminal Mischief for under $250.00, an A misdemeanor, that Weng would not be arraigned, but would be released on a Desk Appearance Ticket.  This conclusion rested upon no more than their joint opinion the damage to plaintiff's car door would only require pulling or pushing out a "dent" in the door: a "dent" neither of them had seen or examined in any of the videos.  The distinction that was ignored was that Weng clearly *intended* to damage plaintiff's vehicle, a Lincoln Town Car, and caused damage estimated at over $900. Taken together, intent and amount, the charge should have been one of Criminal Mischief in the Third Degree, a class E felony, pursuant to PL § 145.05, requiring at the charging stage, an indictment. Ordinarily such a charge could be negotiated down to an A misdemeanor, but this should not have happened upon arrest.  In addition, Weng was not arraigned, but was sent home with a D.A.T., appearing in court over three weeks later.  There are other factors disclosed in discovery, such as failure of a sergeant to sign the D.A.T for 2-3 days; it is enough to register the fact, based upon the videos, that Weng received kid-glove treatment and was never held accountable for the assault and obvious injuries to the plaintiff.

82.     As stated above, Lieutenant Andino affixed himself to Weng, Weng's business partner and the female employees of the nail salon, with Andino spending about 18 minutes of the 21-22 minutes that the police were on the scene with Weng and company.  Throughout the videos, it is Lieutenant Andino, a control person for the 109th Precinct, who issues pronunciamentos on the guilt or innocence of plaintiff and

Weng without questioning plaintiff.  For reasons left to grim speculation, Andino, after the police being present at the site for about 9-10 minutes (9:51 a.m. to 10:01 a.m., 12/26/2018), abruptly decreed that Weng was the victim and that plaintiff was the perpetrator.  He did this without interviewing the witness Pecora, who saw all or most of the fight.  He did not have his officers recover the video cameras that were positioned on the Lake Plaza Diner building next to the parking lot, nor those on the Queens Library building next door, where Pecora worked.  (Pecora pointed the cameras out to Robert Marciano in one video, but P.O. Marciano turned away.)  Lieutenant Andino even said to plaintiff in the ambulance, when plaintiff answered he didn't have a knife, in sum and substance: "There are cameras and cameras don't lie." (Lieutenant Andino was looking right at plaintiff when he said this and saw plaintiff was injured, yet never asked plaintiff how he became injured.)   Plaintiff was charged without anybody asking him any question about what happened.  No police noticed the metal object lying next to Weng's van, of which plaintiff, on urging of Pecora, took photos now in the record, because no police interviewed plaintiff.

83.     Plaintiff was victimized when Weng assaulted him.  He was victimized a second time by Lieutenant Andino conspiring in fact with Weng and his friends to falsely accuse plaintiff of assault and to arrest him in an unconstitutional seizure violative of the U.S. Constitution and New York constitution.  The other officers present, subdued in the presence of Lieutenant Andino, their supervisor, perhaps naturally did not question Andino's conclusions, but there is no evidence that any officer even tried to intervene.

84.     Furthermore, Lieutenant Andino has a history.  Lieutenant Andino was hired as a police officer in 2007, worked his way up to sergeant and in 2018 was promoted to Lieutenant.  Lieutenant, as an officer, originally worked in Far Rockaway precincts.  Eventually, he transferred to Flushing.  There are several cases in which Lieutenant Andino, as a Police Officer, was named in suits.  The cases include the following: (1) Emmanuel Depas v. City of New York et al., Case No. 14-cv-03167-JG-VVP (EDNY) (case

involving "flaking," police planting evidence); (2) <u>Michael Hardy v. City of New York, Anthony Andino, et al.</u>, Case No. 15-cv-06351-ERK-RML (EDNY) (Officer Andino found incredible at suppression hearing and gravity knife evidence suppressed in underlying case); and (3) <u>Guy McEachin v. Police Officer Andre Figueiredo at al.</u>, Index No. 713597/2016 (Queens County Supreme Court) (unlawful stop and frisk, strip search, evidence suppressed).  Based upon the foregoing, the credibility of Lieutenant is seriously in question, in particular as based upon videos where Andino: (a) did no investigation of the assault; (b) failed to question plaintiff with or without and interpreter; (c) arbitrarily manipulated facts to create an outcome in favor of one party (Weng) over another (plaintiff); (d) arbitrarily assigned the arrest to an officer who had nothing to do with the investigations (Barile), making a mockery of legal process; and (e) the implication is that there may have been some illegality occurring in respect to police conduct at the scene of the arrest or thereafter.

## RESULT OF POLICE CONDUCT BASED UPON EVIDENCE INCORPORATED AS INTEGRAL TO THE CASE

85.     Plaintiff was arrested by defendant officers, supervised by Lieutenant Andino: (a) despite plaintiff's visible physical injuries, two of which were bleeding, while defendant Weng had no visible injuries except a tiny shaving cut, and (b) despite defendants asked plaintiff no investigative questions.  The officers did not use a Chinese interpreter, which would have disclosed the fact defendant Weng brandished a metallic implement, a dangerous and life-threatening instrumentality, threatening to strike the plaintiff with said implement.  The attitude was one of callous indifference to the life, safety and welfare of plaintiff.

86.     Defendants cooperated, participated and conspired with defendant Weng to arrest plaintiff, depriving plaintiff of his rights, privileges and immunities secured by the U.S. Constitution, including, but not limited to, plaintiff's right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law.

87.     Plaintiff was placed in an FDNY ambulance.  He asked officers for the coat in his car, as plaintiff was cold and was nearly 70 years of age on December 26, 2018.  Defendants refused and later shackled plaintiff, chaining him inside the ambulance.  The restraint was unreasonable and failure to allow plaintiff to obtain his coat was cruel and unusual treatment given his age, the weather and clearly visible injuries.  These recollections by plaintiff are upon information and belief, as he was in delirium from the attack.[9]

88.     The NYPD took plaintiff in custody to New York Presbyterian-Queens hospital (formerly Booth Memorial), where he was treated in the emergency department.  Plaintiff was diagnosed with "fracture of the lower end of unspecified radius" and "comminuted, impacted fracture of the distal radial metaphysis with dorsal angulation."  The ER put a cast on his wrist.  The NYPD then took plaintiff to the 109th Precinct.  The entire time plaintiff was arrested and treated and taken to arraignment he was handcuffed.

89.     Plaintiff was processed, taken to the holding cells in Kew Gardens, Queens, and, after a wait, was arraigned.  Plaintiff was held about eleven hours despite his injuries.  He had to take a taxi home.

90.     In spite of the fact plaintiff was the victim and defendant Weng was the perpetrator, plaintiff was arrested, charged and arraigned for the following charges: (a) NY Penal Law 120.00-1, Assault in the Third Degree; (b) NY Penal Law 120.14-1, Menacing in the Second Degree; (c) NY Penal Law 265.01-2, Criminal Possession of a Weapon in the Fourth Degree; and (d) NY Penal Law 240.26-1, Harassment in the Second Degree.   (His case docket has been omitted for confidentiality purposes.)

91.     All defendants agreed, cooperated, participated and conspired with their codefendants herein to assist in and effectuate plaintiff's unlawful arrest, detention and malicious prosecution for crimes they knew he did not commit and in so doing deprived plaintiff of the rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, his rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches and

---

[9] Despite May '20 release, there is no EMS evidence.

seizures and the right not to be prosecuted without due process of law or without probable cause.

92.     Following the arrest, plaintiff underwent prosecution.  Plaintiff's counsel told the Queens DA the above story, but it was not until March 26, 2019 the case was dismissed pursuant to CPL 30.30.  Thus, the Queens DA/City waited an unreasonably long time to resolve the blatant defendants' error.

93.     About a month after his arrest, plaintiff was contacted by the Queens DA, who wanted plaintiff to sign papers alleging that defendant Weng kicked and damaged the door of plaintiff's car.  Plaintiff sent a letter objecting to his prosecution, enclosing the DA's invitation to sign a supporting deposition, once more repeating plaintiff was a victim and defendant Weng was perpetrator in plaintiff's case, as a criminal defendant, and that the Queens DA should be prosecuting Weng not plaintiff.   The Queens DA never responded.  (This letter was not produced during discovery and it is believed to have been withheld.)

94.     Plaintiff had surgery on his wrist January 17, 2019.  Thereafter, plaintiff was subjected to prolonged therapy for his wrist for several months.  City defendants have obtained the medical records.

95.     Plaintiff complains of continued pain in his wrist, but also of the shame and scorn he felt during the whole of the arrest, arraignment and court prosecution against him.

96.     Plaintiff has sustained, *inter alia*, deprivation of constitutional rights, loss of enjoyment of life, loss of liberty, physical injuries from defendant Weng, emotional injuries from members of the NYPD, loss of income as bus driver, pain and suffering, emotional distress, humiliation, indignities and embarrassment, degradation.   The state/City actors acted with defendant Weng to inflict some or all of these injuries.

97.     As to defendant Weng, plaintiff has suffered physical pain and suffering, loss of enjoyment of life, mental and psychological distress, medical expenses, loss of income and fear and anxiety.  Defendant S&L Nail Spa is vicariously and negligently liable for the actions of its employee/owner defendant Weng.

98.     The amount of damages sought in this action exceeds the jurisdictional limits of all lower Courts

that might otherwise have jurisdiction.

99.      The actions by defendants herein are neither insulated nor protected by qualified immunity based upon alleged probable cause, in the absence of any probable cause whatsoever under the facts.

### FIRST CLAIM AGAINST ALL CITY DEFENDANTS ACTING WITH DEFENDANT QI JU WENG

### (Conspiracy Claim Under 42 U.S.C. § 1983)

100.     Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "99" above as if set forth more fully herein.

101.     Plaintiff alleges that (1) there was an agreement between the police of the 109th Precinct, as led by Lieutenant Andino, to conspire with defendant Qi Ju Weng to shift blame for the 12/26/2018 assault from Qi Ju Weng to plaintiff; (2) the defendants acted in concert to inflict the injurious arrest of plaintiff under false pretenses via the false story created by police working with Weng; and (3) the overt act to accomplish the joint goal was to create a false scenario, false set of facts and to work together to place plaintiff in a false light by arresting plaintiff as a *fait accompli*, boot-strapping the appearance of guilt by arrest.

102.     City defendants falsely used the premise of a witness to bolster their defense to their conspiracy. Clearly, Weng had a self-serving bias, so the only potential assistance for the City cause was to enlist the witness, Mr. Pecora.  Upon police arrival, Mr. Pecora in multiple videos was seen claiming that plaintiff may have had a razor that he used in self-defense to Weng.  However, almost immediately—within five or more minutes—P.O. Stein, in comprehensively searching plaintiff's fanny pack found that there was no razor, only a cuticle scissors.  The police showed the item to Pecora, who confirmed that was what he saw. The police clearly showed malicious conspiratorial intent when, after disproving the alleged threat, they continued to process plaintiff as an arrest, when he had been severely injured and was clearly not the party inflicting injury.  In addition, the police were negligent in failing to ascertain that Weng first threatened

with a weapon—the metallic object he picked up from the ground, which women with him made him drop. Lieutenant Andino, in particular, with "flaking" in his past, grossly abused his authority once he realized there was no weapon but continued anyway to process the arrest of plaintiff in favor of Weng.

103.    Weng's claims were clearly self-serving lies.  The police involved in the arrest simply chose arbitrarily to adopt Weng's facts—facts that P.O. Byrnes appears to have helped create by feeding or coaxing Weng's story in a direction that Lieutenant Andino and she favored.  Barile was not involved in any way with the creation of the story but was a mere scribe who wrote down ID information and later filled out the paperwork for an arrest he never investigated as portrayed in his own BWC videos.

104.    To turn City defendants' theories on their head, it was never plaintiff who complained about Weng either attacking him or damaging his car, it was witness Pecora who states in the videos Weng both knocked plaintiff down and kicked him on the ground, but he said Weng also kicked plaintiff's car.  The arrest of Weng was largely predicated upon *what the witness said about Weng kicking the car.*

105.    Police officers Byrnes, Barile and Nyndak all appear to have had roles supporting the themes disseminated by Lieutenant Andino and co-defendant Weng, from review of BWC videos.  Very clever was the ploy by the conspirators to arrest Weng for criminal mischief instead of the much more serious assault charges that were inversely and baselessly leveled against plaintiff.  Arresting Weng made it seem that the police were not giving Weng a free pass, when that was exactly what the police were doing.

106.    Defendants agreed, cooperated, participated and conspired to assist in and effectuate plaintiff's unlawful arrest, detainer and malicious prosecution for crimes he did not commit, and in so doing deprived plaintiff of his rights, privileges and immunities secured by the Constitution of the United States, including, but not limited to, his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law.

107.    The conspiracy claim is made against Lieutenant Andino, P.O. Barile, P.O. Byrne, P.O. Nyndak and civilian defendant Weng, acting in league with one another.

108.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

### SECOND CLAIM AGAINST ALL CITY DEFENDANTS

### (False Arrest/Detainer Claim Under 42 U.S.C. § 1983)

109.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "108" above as if set forth more fully herein.

110.    City defendants falsely allege that Weng was a crime victim, when it was clear to anyone with eyes in their head that plaintiff was the victim, not Weng, who literally only had an alleged tiny scratch on his neck, which might have been a shaving cut or a scratch from the nails of the women who tried to hold him back, as they admitted in the videos, from starting to "throw punches" (P.O. Hunna Lipke) at plaintiff. It is also as clear as day that the cuticle scissors would only have been an alleged attempted weapon if they were first introduced into the altercation.  Neglected by the police was an inquiry into the piece of metal that Weng picked up as the first weapon in kind, resulting in plaintiff attempting to defend himself with the absurd cuticle scissors.   If plaintiff had intended to use the scissors to defend against the punches from Weng (such as the punch to the neck/throat that caused plaintiff to bleed), then why did plaintiff put the scissors away? There is no correlation.  Witness Pecora affirmed plaintiff put the scissors in his fanny pack.  Under the circumstances, there was no probable cause to arrest plaintiff, as recited above under the facts. The weight of evidence against Weng as the violent aggressor far outweighed any evidence that the police, under supervision and "verification" (as Barile says) of Lieutenant Andino, used to claim they had probable cause to arrest plaintiff.  It is a question of a mountain (Weng) versus a molehill (plaintiff).

111.    Neither P.O. Barile nor P.O. Byrnes held belief in probable cause of their own evaluation. Barile, as

evident from the videos, did zero investigation into the facts.  Everything he knew or wrote down came straight from the mouth of his supervisor, Lieutenant Andino, who knew all, but refused to consider potential facts from plaintiff, even in the absence of any questioning, with Andino instead favoring Weng, implying something inappropriate was occurring.  For why would Andino relegate credibility to a stranger without any value or item of self-interest?  Byrnes, on the other hand, raced into the scene, ran up to Weng and began putting words into his mouth, helping Weng and his female comrades construct a story.  She then rehearsed what she worked on with Andino to his approval.  Later, when standing 2-3 feet away from injured plaintiff in the ambulance, Byrnes refused to entertain the counter-facts of her partner, P.O. Stein, who recited plaintiff's injuries: broken wrist, bleeding throat/neck and scraped up arm.  Plaintiff never stated he engaged in a fight with Weng.  Plaintiff has stated Weng attacked him, but, when Weng picked up the metal object, plaintiff only brought out the scissors in defense.  When the threat terminated and Weng dropped the metal piece, plaintiff put the scissors way.  Thereafter, Weng walked up to plaintiff and began to beat plaintiff up, resulting in serious injury.  This is not stuff of probable cause.

112.    It's true that the police never used an interpreter to question plaintiff.  The police never questioned plaintiff at all with or without an interpreter.  Instead, they only questioned Weng, feeding him his story or helping him construct one, aided by two women who acted as Weng's Greek chorus.  One of the women, Weng's business partner, had very good English skills and she told most of Weng's story for him, more or less making up facts on the fly.  The police had no reasonable basis to accept anything Weng said, given the fact that they had credible physical evidence of plaintiff's injuries.  Several cops in the videos express doubtful acceptance of what was going on.  Others seem confused—it can be seen in their faces.  Meanwhile there was a core "in-group" of officers working with Lieutenant Andino, who in turn was working with Weng and his friends.  Andino, if anything, was the puppeteer of the little playlet.

113.    All defendants, while acting in concert and, upon information and belief, within the scope of their employment and authority, and without a warrant, seized plaintiff, forcibly put plaintiff into handcuffs in spite of his broken wrist, placed plaintiff under arrest without any reasonable or probable cause to believe that plaintiff had committed, was committing or was about to commit any offense, and caused plaintiff to be detained at two places, and thereby deprived plaintiff of his rights, liberties and freedoms under the color of state law, including plaintiff's right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

114.    The false arrest claim is made against Lieutenant Andino, P.O. Barile and P.O. Byrne.

115.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

### THIRD CLAIM AGAINST ALL CITY DEFENDANTS

### (Malicious Prosecution Claim Under 42 U.S.C. § 1983)

116.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "115" above as if set forth more fully herein.

117.    Plaintiff alleges that City defendants: (1) unjustly initiated a criminal proceeding against plaintiff; (2) the case terminated, in essence, in plaintiff's favor, although it terminated due to a CPL § 30.30 dismissal; (3) there was no probable cause for plaintiff's arrest or his prosecution; and (4) there was actual malice in that City defendants prosecuted plaintiff without any basis, implying a malicious motive in their deliberately favoring the perpetrator of an attack upon plaintiff instead of prosecuting the perpetrator.  The only fact lacking in the scenario is a "post-arraignment" restraint upon liberty.

118.    Defendants shall harken to toll the bell of probable cause to defend against a malicious prosecution claim, although the bell is silent, as there was no probable cause upon which to base prosecution.  Use of discovery obtained from City defendants dissipates reasonableness behind the prosecution, as multiple

facts in the records militate against the People's position, such as the deliberate failure of the police to take the simple, expedient step of obtaining video camera footage from cameras mounted on the diner and library walls, which Lieutenant Andino touted to plaintiff in the ambulance ("Cameras don't lie.").   It is an untrue statement that Barile possessed any evidence of any kind.   It was Lieutenant Andino who controlled and directed the use of all evidence or facts.   Barile merely operated as a scribe, writing down ID information and using facts fed to him by Andino to fill out paperwork.   Barile, rightly by some lights, or wrongly as to the pernicious result, did what Andino told him to do.

119.   Insofar as P.O. Byrnes being liable for malicious prosecution, it was her feeding or coaxing Weng and his entourage in whole or in part that led to plaintiff's arrest via the ratification of Lieutenant Andino. Byrnes's initial involvement led the way toward tarring the plaintiff with the brush of Weng's lies, as she fed, then adopted, the lies as the controlling story of the fight between the parties.   There was no actual "fight," as the incident was limited to an attack by Weng upon the plaintiff, after plaintiff wanted to leave. Plaintiff's putting away of the cuticle scissors, after Weng dropped the piece of metal, signaled that plaintiff was done with the matter, that it was over for him and he wanted to just go.

120.   The CPL § 30.30 dismissal was not a simple administrative dismissal.   Defendant Weng would not sign the supporting deposition in order to end the matter, so that the co-conspirators, including Weng, could walk away from the prosecution of plaintiff, which would have exposed all concerned.   There is no other explanation for why Weng would not cooperate, if the plaintiff had indeed assaulted him.   In an addition, the police and DA went to great lengths to omit witness Pecora from the criminal complaint and the DA prosecution records.   The implication is that those involved wanted to hush up the improper actions that had occurred against the plaintiff leading to plaintiff's false arrest and false prosecution.   Under this scenario the prosecution had terminated in plaintiff's favor.

121.    Defendants, acting in concert and, upon information and belief, within the scope of their employment and authority, caused plaintiff to be prosecuted with malice and without probable cause—a prosecution that *ipso facto* terminated in plaintiff's favor—in violation of plaintiff's right to be free from unreasonable seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

122.    The malicious prosecution claim is made against Lieutenant Andino, P.O. Barile, and P.O. Byrne.

123.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

<u>**FOURTH CLAIM AGAINST ALL CITY DEFENDANTS**</u>

**(Malicious Abuse of Process Claim Under 42 U.S.C. § 1983)**

124.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "123" above as if set forth more fully herein.

125.    Defendants, acting in concert and, upon information and belief, within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside legitimate ends of the process.  Such collateral objective included, but was not limited to, covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification or probable cause.

126.    Defendants in concert: (1) used legal process to prosecute plaintiff unjustly and without probable cause; (2) with intent to harm the plaintiff via his unjust arrest; and (3) in order to obtain the collateral objective of switching liability for the 12/26/2018 assault from Weng to the plaintiff, in order to harm plaintiff by the misuse of process through changing of the facts.  Plaintiff suffered from the use of a valid system for safeguarding the public from criminal acts in order to inflict harm upon plaintiff.  P.O. Barile is

directly liable for completing the papers that led to prosecution of the plaintiff.

127.    The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and that by virtue of the aforementioned acts, plaintiff was deprived of his rights, privileges and immunities secured by the Constitution of the United States, including his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures and to due process of law or arrest and prosecution only under probable cause.

128.    The abuse of process claim is made against Lieutenant Andino, P.O. Barile and P.O. Byrne.

129.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

## Fifth Claim Against All City Defendants

### (Violation of Due Process Claim Under 42 U.S.C. § 1983)

130.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "129" above as if set forth more fully herein.

131.    City defendants' failure—refusal—to investigate did not constitute a failure to adequately investigate; it was rather a concerted decision not to investigate the assault upon plaintiff by Weng at all, by shifting blame to plaintiff.  It was not a matter of incompetence, but a matter of deliberate indifference for an undisclosed improper motive—a motive that can only be inferred from the amalgam of facts present under the specific alleged arrest of plaintiff.  The role of P.O. Barile, P.O. Byrnes and Lieutenant Andino constituted a manufacture of guilt and the creation of a false narrative in tandem with Weng.  What civilian witness, Pecora, said did not jive with the story, so, as shown by records, the police and DA completely omitted Pecora from the criminal complaint and even the notes of the DA were sanitized to eliminate the existence of this witness in early 2019.

132.    Plaintiff absolutely alleges that the police involved, even P.O. Nyndak who downplayed the alleged

criminal mischief of Weng, as seen in Nyndak's second video, all worked together to place Weng, the assailant, in a positive light, while using resources at their disposal to implicate plaintiff.  Evidence is fabricated if it is false.  No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.

133.    City defendants were also aware of exculpatory information in their possession: that plaintiff, in his injured state, could not have been responsible for any attack and that the alleged evidence of the attack—a shaving cut—could not possibly have implicated plaintiff.  Lieutenant Andino is seen shrugging off the injuries of plaintiff as "alright" and "an accident," refusing to investigate the source of the injuries.  This information was withheld from the District Attorney, while promoting a false narrative to prosecute.

134.    By the conduct and actions described above, defendants while engaged under color of state law, conspired to interfere with and violate rights secured to plaintiff by the Constitution of the United States in violation of 42 U.S.C. § 1983, including, but not limited to, plaintiff's Fourth, Sixth and Fourteenth Amendment rights.

135.    Defendants, through the actions alleged above, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain a conviction against plaintiff at all costs.

136.    By refusing to question plaintiff about the facts and to adhere to a false narrative more or less created by defendants P.O. Barile, who signed the Complaint, and P.O. Byrnes, who unreasonably helped Weng create a narrative, as sanctioned by Lieutenant Andino, all defendants joined together to deprive plaintiff of his right to due process, acting in concert.

137.    The violation of due process claim is made against Lieutenant Andino, P.O. Barile, P.O. Byrne, P.O. Nyndak, acting in tandem with civilian defendant Weng, acting in league with one another.

Page **28** of **41**

138.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

### Sixth Claim Against Certain City Defendants

**(Failure to Intervene Claim Under 42 U.S.C. § 1983)**

139.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "138" above as if set forth more fully herein.

140.    This claim involves the fact that officers who were aware that the rights of plaintiff were being violated by fellow officers did nothing to intervene, causing liability for these officers.  The following officers, according to the BWC videos cited above, were fully aware plaintiff's constitutional rights were being violated and had a duty to intercede: P.O. Stein and P.O. Porzelt.  P.O. Stein, who has her own BWC video above, which video appears to be truncated, is the only officer to state plaintiff's injuries: broken wrist, bloody neck, scraped and bleeding arm or wrist.  She looks with incredulity at P.O. Byrnes when Byrnes states Weng with a "scratch" was the victim of plaintiff.  There is clear knowledge on the part of P.O. Stein that something was amiss and that the rights of plaintiff were being tamped down.  P.O. Stein thoroughly searched plaintiff's fanny pack and saw there was no "razor," but cuticle scissors, which she had witness Pecora affirm that is what he saw: scissors not a razor.  P.O. Porzelt, while making unfunny jokes about Chinese, clearly identifies the scissors as implements of "hygiene," not a real weapon.  Porzelt also comments a few times on plaintiff's injuries.  Watching the videos, Lieutenant Andino sidelines Porzelt in favor of Barile, who he assigns to the arrests of plaintiff and Weng.  It is possible that Andino felt Porzelt would not be a team player and might not go along with the scheme to frame plaintiff.  In all events, both P.O. Stein and P.O. Porzelt had a duty to intervene to stop constitutional violations.

141.    Two other officers in the videos, P.O. Tse and P.O. Lipke, show their own unease at what was

occurring.  Tse's unease is expressed in his face, as the viewer can see Tse is not going along with what is occurring, but remains "true blue," and says nothing.  Lipke, talking to Nyndak, says that Weng got out of his car "throwing punches," but errs in saying that plaintiff defended with his scissors.  It is clear, however, that these two officers were not on board with what they saw.  Because no BWC videos were produced for them these two officers cannot be conclusively included as defendants herein.

142.    P.O. Marciano and P.O. Amoroso were also present, but, again, there is no BWC video that was released as to the two officers.  Marciano is seen, however, appearing to support Lieutenant Andino's scheme to implicate plaintiff and it appears Marciano arrived with Lieutenant Andino in Byrnes's video. P.O. Amoroso says nothing but appears to be lurking near Andino.  Later it is P.O. Amoroso who is assigned to escort plaintiff with the ambulance to the hospital.  Amoroso had plaintiff in his custody from about 10:13 a.m. to between 2:00 p.m.-4:00 p.m., after plaintiff was treated in the ER.  Repeated requests for BWC video(s) for Amoroso, who had plaintiff in custody for a protracted period, were rejected.

143.    Each relevant City defendant who saw the occurrence of violations had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in those defendants' presence by other defendants, but failed to intervene to prevent unlawful conduct, despite having had a realistic opportunity to do so, in violations of plaintiff's rights under the First, Fourth and Fourteenth Amendments to the United States Constitution.

144.    The failure to intervene claim is made against P.O. Stein and P.O. Porzelt.  Lieutenant Andino can also be included under this claim, as he, beyond anybody, had all the facts to halt plaintiff's arrest.

145.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

## Seventh Claim Against All City Defendants

### (No Qualified Immunity Pursuant to 42 U.S.C. § 1983)

146.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "145" above as if set forth more fully herein.

146.    Enumerated defendants are not shielded by qualified immunity as the City defendants' conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known.  The defense gives ample room for mistaken judgments, except where, as here, the officers were either plainly incompetent and/or knowingly violated the law.  The law was sufficiently clear that each City defendant would have to have known what they were doing to plaintiff was unlawful.

147.    City defendants are not protected for plaintiff's false arrest as (1) it was NOT objectively reasonable to believe probable cause existed or (2) officers of reasonable competence could NOT have disagreed on whether there was probable cause to arrest plaintiff on assault charges.  In truth, the verification and seal of approval of Lieutenant Andino weighed heavily against independence in the context of this case, but all officers, who generally had been on the force 3 or more years, were bound by the standards recited herein and were seasoned enough to realize and apply those standards.  Among the multiple City defendants herein, collectively, there could have been no "arguable probable cause" under the very clear facts present at the scene of the arrest on 12/26/2018.  It was no more than a conspiracy led by Lieutenant Andino that resulted in the arrest and prosecution of plaintiff based upon false evidence.

148.    P.O. Barile's arrest was based upon nothing, as he only did the paperwork and never saw plaintiff but for the few minutes when he took down plaintiff's ID information.   When plaintiff tried to talk to Barile, in the first Barile video, P.O. Barile shuts plaintiff down and says he will talk to him "later," but never returns. It was P.O. Amorosa that took plaintiff to the hospital, Barile had no more interaction than a few minutes in the ambulance. All information Barile had was fed to him by Lieutenant Andino. Nothing occurred in Barile's presence or was derived from firsthand knowledge on the basis of an investigation.

Clearly shown in the videos, Barile merely acted as a scribe, writing down ID information.  He never questioned either Weng or witness Pecora.  There is nothing, incidentally, in the criminal complaint about Pecora, nor was there anything in the DA's notes.

149.    Barile and Byrnes had no arguable probable cause upon which to place plaintiff's arrest. On the other hand, Barile—and P.O. Nyndak—in the two last chronological videos were aware of facts leading to the arrest of Weng for criminal mischief.  The facts—again lacking a true investigation—were that civilian witness Pecora told police that Weng kicked plaintiff's car door.   Without looking at or assessing the damage, Barile and Nyndak find that Weng has only committed an A misdemeanor, when Weng's intent to damage and cost of damages to the car should have made the offense an E felony. This was clearly an incompetent investigation.   Plaintiff's arrest by Barile was based on nothing.   Byrnes showed incompetence in her manner of questioning Weng at the start of the video sequence.  She coaxes Weng, puts words into his mouth, then muddles the facts.  P.O. Byrnes also includes Weng's wife and Weng's business partner in the exchange, creating an improvised story based upon no actual evidence.  Byrnes, rather than investigating, amplified Weng's self-serving story.  The questioning is more of a frenzied conversation than any investigation.  Lieutenant Andino shortly thereafter places his seal of approval on the manufactured tale, getting the story he clearly was seeking.  There was clear bias by the police.

150.    Because there was no arguable probable cause, nor competence shown in the arrest, and based upon allegations herein and the actual video footage, no police officers herein are entitled to qualified immunity.

151.    No qualified immunity should be accorded any officer, including Lieutenant Andino, P.O. Barile, P.O. Byrne, P.O. Nyndak, P.O. Stein and P.O. Porzelt.

152.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

## EIGHTH CLAIM AGAINST ALL CITY DEFENDANTS

**(Municipal Liability "Monell" Claim Under 42 U.S.C. § 1983)**

153.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "152" above as if set forth more fully herein.

154.    There were clear constitutional violations by the defendant police officers above, which led to the liability of defendant City of New York, the employer of said officers.

155.    The violations had underpinnings in official policy as: (a) upon information and belief, police officers are subject to the discretion of commanding officers or supervisors, such as Lieutenant Andino, and in the presence of a supervising officer, the police officers have limited discretion; (b) Andino, as an agent of formal City policy, was directly responsible for making, enforcing and implementing the policy that infringed upon plaintiff's rights; (c) in the event that Lieutenant Andino had professed that he objected to the arrest, the policy of supervisors professing to do no more than "verify" an arrest gave free reign for the unconstitutional abuse of plaintiff; and (d) the failure to train or properly supervise the officers responsible for plaintiff's arrest or to properly train or supervise Lieutenant Andino as a supervising officer showed official deliberate indifference to the rights of plaintiff.  There was a direct link between the evocation of official policy above and the deprivations of the plaintiff herein.

156.    As one glaring example of incompetent or discriminating official policy, all police responses to an arrest should include officers who should be fluent in the language of the parties involved.  On the contrary, the officers in the videos shrug off or joke about the language barrier between English-speaking officers and Cantonese-speaking plaintiff and Mandarin-speaking Weng.  Watching the videos it is clear that the police give credence to Weng's business partner, who is fairly fluent in English, while Weng's English is nearly incoherent (e.g. Byrnes's 7+ minute video).  Later, when Barile is acting as a scribe, in his first video in time sequence, writing down plaintiff's ID information, a conversation is overheard

between the female EMT employee in the video and plaintiff.  The EMT asks plaintiff how much pain he is in on a scale of 1 to 10.  Plaintiff clearly has no idea of what she is asking him.  Then the EMT simplifies, asking if plaintiff is in a lot of pain and he says: "Very pain."  Clearly defendant Weng and plaintiff were not the primary authors of the story. It was P.O. Byrnes, accompanied by Lieutenant Andino, who concoct the story of defendant Weng as victim and plaintiff as assailant.  Added to the fact that plaintiff was in delirium after defendant Weng's assault, the language barrier was great during the police presence.  Barile doesn't even attempt a conversation with plaintiff, rebuffing plaintiff when he tries to speak with him.  Later, Barile avoids talking to Weng, letting P.O. Nyndak, a non-Chinese-speaking Tibetan American, do all the flimsy questioning of Weng.  In reality, there was no questioning, as Nyndak tries to soothe Weng with reassuring talk and how sorry the police are to have arrested him.  The loan Chinese-American officer, P.O. Tse, is not asked nor enlisted in questioning the parties in the videos.  On an official level, nobody at all was concerned what the Asian ethnic parties were really saying.

157.   On a "failure to train" level, the failure of Lieutenant Andino to properly supervise an investigation, to place himself at a remove, was mere false posing to give the impression that he was "learning" facts from his officers, when Andino didn't avail himself of camera footage that would have recorded the assault or interview witness Pecora, who does not appear in any official reports or the criminal complaint.[10]  It is possible that Andino, promoted to lieutenant in 2018, did not know his job well enough to know how to supervise the officers because his *laissez-faire* behavior in the videos is incomprehensible.  Given the history of Andino with lawsuits for "flaking," etc., Andino did not know or deliberately did not do his job.

158.   The individual defendants, singly and collectively, while acting within the scope of their employment and authority, and under color of state law, engaged in conduct that constituted customs, policies, practices, procedures, rules or usages of the NYPD and their specific precinct(s), of the Queens

DA and of the City of New York forbidden by the Constitution of the United States, under <u>Monell v. Dept.</u> <u>of Soc. Servs. of N.Y.</u>, 436 U.S. 658, 690-91, 98 S.Ct. 2018 (1978).

159.     The foregoing customs, policies, practices, procedures, rules and usages include, but are not limited to, making arrests without probable cause, initiating and continuing prosecutions without probable cause, and committing perjury.  This includes, without limitation, practices of defendant City and the NYPD:

(a.)     police officers, more or less, randomly assigning roles of perpetrator and victim to parties when responding to a call to a scene of crime or mayhem;

(b.)     failure of responding officers to properly assess facts at a scene, failing to properly locate and assess evidence in connection with claims of parties at scene;

(c.)     officers at the scene of a call failing to employ qualified language interpreters;

(d.)     practice of police officers to forge ahead with an arrest once a suspect is handcuffed; and

(e.)     defendant City and its instrumentality of the NYPD having notice of the deficits of the foregoing, failing to curb or control the use of said practices.

160.     The abuse to which plaintiff was subjected was consistent with an institutionalized practice of the NYPD, which is known and ratified by defendant City.

161.     Despite knowledge of these institutionalized practices, defendant City has at no time taken any effective action to prevent NYPD personnel from continuing to engage in this type of misconduct.

162.     Defendant City had prior notice of the unlawful propensities of defendants, but took no steps to train them, correct their abuse of authority or to discourage their unlawful use of authority.

163.     The failure of defendant City to properly train defendants included the failure to instruct them in applicable provisions of the State Penal Law of the State of New York, federal and state constitutional limitations and the proper and prudent use of investigative techniques and use of restraints.

---

[10] Barile is seen in the videos speaking to Pecora.     Page **35** of **41**

164.    Defendant City authorized, tolerated as institutionalized practices and ratified the misconduct detailed above by, among other things:

(a.)    failing to properly discipline, train, restrict and control employees, including defendants, known to be irresponsible in their dealings with citizens of the community;

(b.)    failing to take adequate precautions in the training, hiring, promotion and retention of police personnel, including specifically defendants herein;

(c.)    failing to forward to the offices of the Queens DA evidence of criminal acts committed by police personnel;

(d.)    failing to establish or assure the functioning of a bona fide and meaningful departmental system for dealing with complaints of police misconduct, but instead responding to these types of complaints with bureaucratic power and official denials calculated to mislead the public; and

(e.)    that failure to supervise and/or train by defendant City of defendants herein rose to the level of deliberate indifference to the consequences of its actions, and indifference to plaintiff's rights, privileges and immunities secured by the Constitution of the United States of America, *inter alia*, plaintiff's Fourth and Fourteenth Amendment rights.

165.    The NYPD has inadequately screened, hired, retained, trained and supervised its employees, including the individual defendants herein, to respect the constitutional rights of those individuals with whom NYPD police officers come into contact.

166.    The foregoing customs, policies, practices, procedures, rules and usages constituted deliberate indifference to plaintiff's safety, well-being and constitutional rights.

167.    The foregoing customs, policies, practices, procedures, rules or usages were the direct and proximate cause of the constitutional violations suffered by plaintiff and the escape from liability or

culpability of the actual perpetrator, defendant Weng.

168.   The foregoing customs, policies, practices, procedures, rules or usages were the moving force behind the constitutional violations suffered by plaintiff.

169.   The <u>Monell</u> claim is made against defendant City of New York, as demonstrated by the actions of Lieutenant Andino,  P.O. Barile, P.O. Byrne, P.O. Nyndak, P.O. Stein and P.O. Porzelt.

170.   Wherefore, plaintiff demands judgment in the sum of $751,000.00.

## NINTH CLAIM AGAINST ALL CITY DEFENDANTS

### (VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE NEW YORK STATE CONSTITUTION)

171.   Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "170" above as if set forth more fully herein

172.   City defendants, acting in concert and, upon information and belief, within the scope of their employment and authority violated plaintiff's right to be free of unreasonable and unlawful searches and seizures under Article I, § 12 of the New York State Constitution.

173.   City defendants, acting in concert and, upon information and belief, within the scope of their employment and authority, consciously disregarded known and excessive risks to plaintiff's liberty and welfare and, conspiring with defendant Weng, engaged in a deliberate and unjustified effort to manufacture guilt against plaintiff in furtherance of a plan to secure and sustain an unjust conviction against plaintiff.

174.   Upon information and belief, this included a course of conduct and pattern of behavior whereby defendants, *inter alia*, created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had committed one or more offenses, intentionally and maliciously concealed material exculpatory evidence and unduly influenced the statements and testimony of witnesses by means of coercion, violence or deceit.

175.     That by virtue of the aforementioned acts, City defendants deprived plaintiff of his liberty and property without due process of law, in contravention of Article I, § 6 of the New York State Constitution.

176.     Defendant City is liable for the damages suffered by plaintiff as a result of the conduct of its agents, servants and/or employees under the doctrine of *respondeat superior.*

177.     Wherefore, plaintiff demands judgment in the sum of $751,000.00.

### TENTH CLAIM SOLELY AGAINST DEFENDANT QI JU WENG

### (CLAIMS IN INTENTIONAL TORTS BY QI JU WENG)

178.     Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "177" above as if set forth more fully herein.

179.     Private actor defendant Weng committed the deliberate and vicious attack upon plaintiff that led to the state actors herein to commit subsequent misconduct above-described; Weng also conspired with the state actors to concoct the deceitful story that led to plaintiff's arrest in concert with City defendants.

180.     Without provocation, defendant Weng threatened plaintiff with a metallic object or instrumentality that could have caused plaintiff life-threatening injuries or death, leading plaintiff to defend himself with cuticle scissors, which state actors used in an attempt to place blame upon plaintiff, but without state actors conducting a proper investigation that would have led to discovery of defendant Weng's use of a weapon.

181.     Defendant Weng punched plaintiff in the throat, causing abrasions and contusions to plaintiff.

182.     Defendant Weng kicked plaintiff's leg, causing him to fall and break his left wrist.

183.     Defendant Weng thereafter kicked the door to plaintiff's car causing damage that was evaluated as $937.68.   The Queens DA began a prosecution solely limited to damage to plaintiff's car, but plaintiff refused to participate as the Queens DA refused to prosecute the assault by defendant Weng.

184.     Defendant Weng is responsible for the medical costs, rehabilitation therapy costs for plaintiff's

wrist, lost income and car damage payable to plaintiff in a sum undetermined.

185.    Defendant Weng caused plaintiff fear, anxiety, pain, mental and emotional suffering.

186.    Defendant Weng falsely alleged to City defendants that he, Weng, had been the victim of an attack, causing City defendants to arrest and prosecute plaintiff, causing P.O. Barile to perjure himself in a criminal complaint, alleging facts of which Barile had no knowledge or which he knew to be untrue.

187.    It was the acts of defendant Weng that led to defendants City, Lieutenant Andino, P.O. Barile and P.O. Byrnes to deprive plaintiff of his rights, immunities and protections under the Fourth and Fourteenth Amendments of the U.S. Constitution, as the state actors solely credited the lies of defendant Weng and used his false information to harm and assail the plaintiff.

188.    Wherefore, plaintiff demands judgment in the sum of $751,000.00.

**ELEVENTH CLAIM JOINTLY AND SEVERALLY AGAINST DEFENDANTS WENG & S&L NAIL SPA INC.**

**(CLAIMS IN NEGLIGENCE & NEGLIGENT HIRING)**

189.    Plaintiff restates and realleges the allegations contained in Paragraphs "1" to "188" above as if set forth more fully herein.

190.    On December 26, 2018, and at all times herein mentioned, defendant Weng was an employee and an owner of S&L Nail Spa Inc. in Uniondale, New York.

191.    S&L Nail Spa Inc., upon information and belief, is a New York State Domestic Corporation engaging in a business for profit.

192.    On December 26, 2018, defendant Weng was acting in an employee or official capacity, driving employees of S&L Nail Spa to work in a private van owned by defendant Weng.

193.    At the time defendant Weng accosted plaintiff he was acting in his employee or official capacity as a servant of S&L Nail Spa.

194.    At the time defendant Weng attacked and injured the plaintiff he was acting in his employee or official capacity as a servant of S&L Nail Spa.

195.    Defendant Weng caused plaintiff great pain, suffering and loss which are imputable to his employer or his company, S&L Nail Spa, as defendant Weng was acting as the servant of said entity.

196.    Defendant S&L Nail Spa was careless, reckless and negligent in the hiring and retention of its servant defendant Weng as a driver, a job where he would come into contact with members of the public; defendant S&L Nail Spa was aware and knowledgeable of defendant Weng's propensity for violence.

197.    Defendant S&L Nail Spa's action in hiring and retaining defendant Weng was reckless and showed a gross disregard for the safety of others including the plaintiff, who was injured by defendant Weng.

198.    As a result, plaintiff demands judgment against defendant S&L Nail Spa, joint and severally with Weng, as owner, in an amount commensurate with the injuries and damages sustained herein, together with costs and disbursements of this action, in an amount that exceeds jurisdictional limits of all lower courts.

199.    Wherefore, plaintiff demands judgment in the sum of $751,000.00 under theories of respondeat superior and vicarious liability.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands the following relief jointly and severally against all the defendants and, separately, demands said relief against defendants Weng and employer S&L Nail Spa, private actors:

(a.)    Compensatory damages in an amount to be determined at trial;

(b.)    Punitive damages in an amount to be determined at trial;

(c.)    Attorney's fees pursuant to 42 U.S.C. § 1988;

(d.)    An award of plaintiff's costs of suit;

(e.)    Pre-judgment and post-judgment interest;

(f.)      An award of the foregoing of no less than $751,000.00, as estimated by plaintiff;

(g.)      A separate award against defendants Weng and S&L Nail Spa, and in the event the Court so finds, an award of separate damages solely focused on defendant Weng's physical assault on plaintiff and damage to his vehicle and negligence and negligent hiring by S&L Nail Spa; and

(h.)      Such other and further relief as this Court deems just and proper.

Dated:          September 5, 2021*

> *Michael R. Curran /s/_*
> Michael R. Curran
> *Attorney for Plaintiff*
> 36-09 Main Street, Suite 9B
> Flushing, New York 11354
> (347) 549-2079 (cell)
> mrc4law@yahoo.com

**\*Refiled 01/15/2022, striking the Seventh Claim relating to "Qualified Immunity," as held by Hon. Sanket J. Bulsara, U.S. Magistrate Judge, 12/29/2021, in his Report & Recommendation, ECF Doc. 99, and as adopted on 01/14/2022, by Hon. Rachel P. Kovner, United States District Judge.**